# In the United States Court of Federal Claims

No. 12-627C
(Filed December 20, 2012)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * | * |
| | * Protest of agency in-sourcing |
| **DELLEW CORPORATION,** | * decision; 28 U.S.C. § 1491(b)(1) |
| | * (2006); Department of Defense |
| Plaintiff, | * in-sourcing under 10 U.S.C. |
| | * §§ 129a, 2463(e) (Supp. V |
| v. | * 2011); standing; mootness; |
| | * timing of in-sourcing decision; |
| **THE UNITED STATES,** | * reasonableness of decision to in- |
| | * source based on cost; equitable |
| Defendant. | * estoppel. |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * | * |

_James F. Nagle_, Seattle, WA, for plaintiff.  _Jonathan A. DeMella_ and _Kate H. Kennedy_, Oles Morrison Rinker & Baker LLP, of counsel.

_William P. Rayel_, Washington, DC, with whom was _Acting Assistant Attorney General Stuart F. Delery_, for defendant.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This post-award bid protest is before the court after argument on cross-motions for judgment on the administrative record and defendant's motion to dismiss, involving a decision to in-source under the Department-of-Defense-wide statutory mandate to use civilian contractors in lieu of private-sector contractors.  Dellew Corporation ("Dellew" or "plaintiff") challenges the Department of the Air Force's (the "Air Force") decision to in-source awards and personnel-management support services previously performed by Dellew at nine Air Force bases.  Plaintiff asserts that the Air Force's in-sourcing decision contravened the applicable statutes, 10 U.S.C. §§ 129a, 2463(e) (Supp. V 2011), and regulations.  Even absent this defect in the procurement process, plaintiff faults the in-sourcing decision as based on a flawed cost analysis and therefore lacking a rational basis. Defendant responds that the current versions of sections 129a and 2463(e) are inapplicable because the in-sourcing decision occurred in 2010—before the statutes became

effective—but more fundamentally contends that the applicable statute is budgetary and contemplates no private right of action so that prudential standing is lacking.

## BACKGROUND

I.  The statutory and regulatory scheme governing in-sourcing decisions

The National Defense Authorization Act ("NDAA") for Fiscal Year 1991 enacted 10 U.S.C. § 129a, which was entitled "General personnel policy" and provided:

> The Secretary of Defense shall use the least costly form of personnel consistent with military requirements and other needs of the Department.  In developing the annual personnel authorization requests to Congress and in carrying out personnel policies, the Secretary shall –
>
> (1) consider particularly the advantages of converting from one form of personnel (military, civilian, or private contract) to another for the performance of a specified job; and
>
> (2) include in each manpower requirements report submitted under section 115a of this title a complete justification for converting from one form of personnel to another.

NDAA for Fiscal Year 1991, Pub. L. 101-510, 104 Stat. 1485, § 1481 (1990); see also 10 U.S.C. § 129a (2006).

On January 28, 2008, Congress amended 10 U.S.C. § 2463 to require the U.S. Department of Defense ("DoD") to "devise and implement guidelines and procedures to ensure that consideration is given to using, on a regular basis, [DoD] civilian employees to perform new functions and functions that are performed by contractors and could be performed by [DoD] civilian employees."  NDAA for Fiscal Year 2008, Pub. L. 110-181, 122 Stat. 3, § 324; see AR 1231.

DoD issued the guidelines and procedures required by the 2008 amendment on April 4, 2008.  See AR 1231-41.  The "Guidelines and Procedures for Implementation of 10 U.S.C. § 2463" set forth several considerations and procedures governing 10 U.S.C. § 2463 actions. Id. at 1237-38.  Although the guidelines allowed some DoD functions to be eliminated or converted to government performance without a supporting economic analysis, they required, in part:

> [F]or all other functions that are performed under contract but that could be performed by DoD civilian employees, DoD Components shall perform an economic analysis to determine whether DoD civilians or private sector contractors are the low cost provider and should perform the work. Qualified cost analysts/experts shall perform the analyses using cost factors/models that account for the full costs of manpower, as appropriate, and make "like comparisons" of all relevant costs. Decisions on which costs to include (e.g., overhead, facilities, equipment, supplies, health and retirement benefits) shall depend on what is needed to achieve "like comparisons" and whether the costs are of sufficient magnitude to influence the final decision.

Id. at 1237. In addition to an economic analysis, the guidelines also required DoD to follow standard manpower management procedures:

> When a DoD Component . . . is considering whether to convert from contractor to government performance, manpower managers shall follow standard manpower management procedures to determine and validate manpower requirements. This shall include verifying the mission, functions, and tasks to be performed, required level of performance, and (consistent with title [sic] 10 U.S.C. § 129) workload necessary for mission success.

Id. at 1238.

On April 8, 2009, DoD issued Resource Management Decision ("RMD") 802, which realigned resources for DoD for fiscal years 2010-14 1/ by decreasing funding for contract support and increasing funding for civilian manpower authorizations. See id. at 1242. To assist DoD with developing and executing plans to meet the requirements of RMD 802, the Deputy Secretary of Defense issued an "In-Sourcing Implementation Guidance" on May 28, 2009. Id. at 1242-59. Paragraph 4.3 of the Guidance provided that, "[i]f possible, contracted services that have option-years that will be exercised during FY 2010 should be identified for in-sourcing in FY 2010." Id. at 1250. The guidance also noted in ¶ 5.2.1.2.:

> If DoD civilian employees cannot be obtained within the required timeframe, [2/] but are determined to be the most cost effective provider, as

---

1/ The fiscal year for the Government is October 1 through September 30.

2/ The May 28, 2009 In-Sourcing Implementation Guidance did not appear to specify the duration of the "required timeframe" for obtaining DoD civilian employees. See AR at 1251. The Guidance included a chart, however, stating that in-sourcing should occur "as expeditiously as possible" once a cost comparison shows that civilian performance would be more cost effective. Id. at 1246.

addressed in paragraph 5.2.2 below, [3/] the requiring official shall obtain contract support on a temporary basis (not to exceed 12 months at a time), and work with the HRO [Human Resources Office] Director to formulate a plan for transitioning to DoD civilian employee performance as quickly as practical.

Id. at 1251 (underscoring in original).

On January 29, 2010, DoD published DTM 09-007, which established business rules for use across DoD in estimating and comparing the full costs of DoD manpower (military and civilian) and contract support.  Id. at 1260-62.  Shortly thereafter, the Air Force Manpower Agency (the "AFMA") incorporated the procedures outlined in DTM 09-0007 into a database tool, "DTM-COMPARE," for conducting cost analyses of in-sourcing decisions.  Id. at 1287.  Throughout 2010 the Air Force issued various in-sourcing guidance documents, including the "In-sourcing Procedures Guide," id. at 1289-1349, which provided checklists and procedures for utilizing DTM-COMPARE.   An additional guidance document, the "PACAF In-sourcing Guide," dated August 4, 2010, described a "certification process" for in-sourcing determinations and stated that an in-sourcing analysis showing cost savings should be forwarded to "A12 [the Deputy Director of Manpower, Personnel and Services] for approval" and  to AFMA for validation/approval."  Id. at 1350; see also id. at 1510-12.

In 2011 Congress enacted two statutes amending 10 U.S.C. § 2463: the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("Ike Skelton NDAA") and the NDAA for Fiscal Year 2012.  The Ike Skelton NDAA was effective January 7, 2011, and provided, as follows:

> In deciding which functions should be converted to performance by Department of Defense civilian employees pursuant to section 2463 of title 10, United States Code, the Secretary of Defense shall use the costing methodology outlined in the Directive-Type Memorandum 09-007 (Estimating and Comparing the Full Costs of Civilian and Military Manpower and Contractor Support) or any successor guidance for the determination of costs when costs are the sole basis for the decision.  The Secretary of a

---

3/  Paragraph 5.2.2. instructed DoD components to comply with the business rules in Directive-Type Memorandum ("DTM") 09-007 when conducting a cost analysis to support an in-sourcing decision.  AR at 1252.

military department may issue supplemental guidance to assist in such decisions affecting functions of the military department.

Ike Skelton NDAA, Pub. L. 111-383, 124 Stat. 4137, 4184. The NDAA for Fiscal Year 2012, effective December 31, 2011, amended 10 U.S.C. § 2463 to include the following provisions:

(e) Determinations relating to the conversion of certain functions.–(1) Except as provided in paragraph (2), in determining whether a function should be converted to performance by Department of Defense civilian employees, the Secretary of Defense shall –

(A) develop methodology for determining costs based on the guidance outlined in the Directive-Type Memorandum 09-007 entitled "Estimating and Comparing the Full Costs of Civilian and Military Manpower and Contractor Support" or any successor guidance for the determination of costs when costs are the sole basis for the determination;

(B) take into consideration any supplemental guidance issued by the Secretary of a military department for determinations affecting functions of that military department; and

*(C) ensure that the difference in the cost of performing the function by a contractor compared to the cost of performing the function by Department of Defense civilian employees would be equal to or exceed the lesser of –*

*(I) 10 percent of the personnel-related costs for performance of that function; or*

*(ii) $10,000,000.*

. . . .

(f) Notification relating to the conversion of certain functions.– The Secretary of Defense shall establish procedures for the timely notification of any contractor who performs a function that the Secretary plans to convert to performance by Department of Defense civilian employees pursuant to subsection (a). The Secretary shall provide a copy of any such notification to the congressional defense committees.

NDAA for Fiscal Year 2012, Pub L. 112-81, 125 Stat. 1298, 1547 (2011) (emphasis added).

The NDAA for Fiscal Year 2012 also amended 10 U.S.C. § 129a, thereby requiring the Secretary of Defense to "establish policies and procedures for determining the most appropriate and cost efficient mix of military, civilian, and contractor personnel to perform the mission of the [DoD]." Id. at 1542-43. The amendment added § 129a(e) to Title 10, which provided the following "considerations in converting performance of functions:"

If conversion of functions to performance by either Department of Defense civilian personnel or contractor personnel is considered, the Under Secretary of Defense for Personnel and Readiness shall ensure compliance with–

(1) section 2463 of this title (relating to guidelines and procedures for use of civilian employees to perform Department of Defense functions); and

(2) section 2461 of this title (relating to public-private competition required before conversion to contractor performance).

Id.; see also 10 U.S.C. § 129a(e) (Supp. V 2011).

The second "consideration" referenced in § 129a(e) – compliance with 10 U.S.C. § 2461 – provides that "[n]o function of the [DoD] performed by [DoD] civilian employees may be converted, in whole or in part, to performance by a contractor unless the conversion is based on the results of a *public-private competition*." 10 U.S.C.A. § 2461(a) (2012) (emphasis added). Pursuant to the Omnibus Appropriations Act of 2009, however, DoD is prohibited from using public-private competitions to convert federal civilian performance to contractor performance:

None of the funds appropriated or otherwise made available by this or any other Act may be used to begin or announce a study or public-private competition regarding the conversion to contractor performance of any function performed by Federal employees pursuant to Office of Management and Budget Circular A-76 [4/] or any other administrative regulation, directive, or policy.

---

4/ Office of Management and Budget Circular A-76 provides in-sourcing and out-sourcing guidance to DoD and other federal agencies. See Def.'s Br. filed Nov. 2, 2012, App. at 8-17.

Omnibus Appropriations Act of 2009, Pub. L. 111-8, 123 Stat. 524, § 737.

II. Dellew's contract

The administrative record and the parties' filings trace the history of this protest. On or about July 18, 2008, the Air Force awarded Contract No. FA5215-08-C-0008 (the "Contract") to Dellew to provide awards and decorations ("A&D") and personnel systems management ("PSM") support services at nine locations in the Pacific Air Forces ("PACAF") Major Command – Andersen Air Force Base ("AFB"), Eielson AFB, Elmendorf AFB, Hickam AFB, Kadena Air Base ("AB"), Kunsan AB, Misawa AB, Osan AB, and Yokota AB.  AR at 431-38.   Pursuant to the Contract, Dellew provided general guidance on A&D, processed award recommendations and decisions, and furnished information technology support for the bases' personnel data systems.  Id. at 498-500.

The Contract included an initial eight-month period, from August 1, 2008, through March 31, 2009, and five option periods: (1) April 1, 2009, through March 31, 2010; (2) April 1, 2010, through March 31, 2011; (3) April 1, 2011, through March 31, 2012; (4) April 1, 2012, through March 31, 2013; and (5) April 1, 2013, through June 30, 2013.  Id. at 433-67.  On February 4, 2009, the Air Force issued Modification No. P00002, which exercised the first option period and funded the first option period through March 31, 2010. Id. at 619-24.  On January 28, 2010, the Air Force issued Modification No. P00004, which exercised the second option period and funded the second option period through March 31, 2011.  Id. at 668-75.  In early 2011 the Air Force exercised the third option period and funded the third option period through March 31, 2012. 5/  Modification No. P00010, dated February 29, 2012, exercised the fourth option period, but only incrementally funded the fourth option period for six months, from April 1, 2012, through September 30, 2012.  Decl. of Mia Lalau dated Sept. 22, 2012 ("Lalau Decl."), ¶ 6. 6/  On April 2, 2012, the Air Force

_____

5/  Both parties agree that the Air Force exercised the third option period.  See Pl.'s Br. filed Oct. 23, 2012, at 15 n.8; Def's Br. filed Nov. 2, 2012, at 3.  Although plaintiff states that the third option period was exercised pursuant to Modification No. P0006, dated February 3, 2011, see Pl.'s Br. filed Oct. 23, 2012 at 15 n.8, the administrative record does not contain a copy of a modification exercising the third option period.  The parties also apparently did not include Modification No. P0006 in any of their filings with the court.

6/  The administrative record also omits a copy of Modification No. P00010.  That document was attached as an exhibit, however, to a declaration that plaintiff submitted in support of its September 24, 2012 Application and Motion for Temporary Restraining Order and Preliminary Injunction.  See Lalau Decl., Ex. A.  Citing AR 1556 and 1558, defendant admits that the Air Force "exercised the first four option periods of Dellew's contract,

notified Dellew that it was terminating the Contract for convenience, effective October 1, 2012. AR at 1561. The termination of the Contract was based upon the Air Force's decision to in-source the work performed by Dellew. Id. at 1560, 1565.

III.   The Air Force's decision to in-source the services under the Contract

In a memorandum dated January 19, 2010, Secretary of the Air Force Michael B. Donley advised all Major Commands to gather additional data on service contracts to ensure compliance with service contract reporting requirements and to "[s]uccessfully implement [the Air Force's] in-sourcing program." Id. at 1452. On February 17, 2010, Major General and Vice Commander Douglas H. Owens issued a memorandum requesting "service contract Functional Commanders/Directors . . . to complete and certify a series of questions . . . about every service contract they funded in FY08/FY09." Id. at 1392-93. Major General Owens wrote that the questionnaire was necessary to complete a "three phase effort associated with RMD 802, Contract In-sourcing, which cuts PACAF's service contract budget line by upwards of ~$60M annually while phasing in 361 new civilian authorizations." Id. at 1392. By e-mail dated February 22, 2010, Donna Nishimura, Contract Specialist for PACAF, requested Marcellus Baker, Chief of Quality Assurance for PACAF, to complete the aforementioned questionnaire for Dellew's contract by March 1, 2010. Id. at 1372.

On February 26, 2010, following a meeting during which the in-sourcing of the Contract apparently was discussed, Captain Jason L. Munro, Deputy Chief, Performance Management and Organization for PACAF, circulated a proposed "[b]reakdown post-insourcing" via e-mail, identifying twenty-four DoD civil service positions to perform the

---

6/   (Cont'd from page 7.)

although the fourth option period was only funded for six of the 12 months." Def.'s Br. filed Nov. 2, 2012, at 3. AR 1556-59, however, is an e-mail chain, dated January 25-26, 2012, in which the Air Force internally discussed how to proceed with Dellew's contract. See AR 1556-59. As discussed in greater detail in the body of this opinion, those e-mails actually indicated that the Air Force would "extend" the Contract for six months, rather than exercise the fourth option period. See id. at 1556 (e-mail from Ryan Y. Sakagawa, Chief of PACAF's Resources & Requirements Branch, stating, "PACAF/A1 would like to elect a 6-month extension to the . . . contract. We understand with this extension that no option can be exercised."). The Air Force ultimately did not proceed as it had planned, however, when Modification No. P00010 "exercise[d] Option Period Four of the contract" while "incrementally fund[ing] the period for six months" from April 1, 2012, to September 30, 2012. Lalau Decl. ¶ 6.

work at the nine bases under Dellew's contract. Id. at 1458-59. Attached to the e-mail was an "In-Sourcing Prescreening Case Summary" that identified a 9.78% savings from in-sourcing Dellew's contract from Fiscal Year 2010 through Fiscal Year 2014. Id. at 1460.

On or about May 4, 2010, PACAF utilized DTM-COMPARE to perform a cost comparison of Dellew's contract. See id. at 22-410 (DTM-COMPARE Reports), 1513. The cost comparison, summarized in an In-Sourcing Worksheet, showed that PACAF would obtain a cost savings of $1,186,048.00, or 9%, by in-sourcing the Contract. Id. at 1513-15. PACAF's manpower office certified the cost comparison on June 10, 2010, and PACAF's civilian personnel, contracting, and financial management offices certified the cost comparison on June 17, 2010. Id. at 1514. PACAF Functional Commander Clifford J. Hogue signed a certification that same day approving the in-sourcing initiative. Id. at 1515.

From June 22 to June 25, 2010, PACAF held a Contract Review Board meeting, the purpose of which was to "ensure that PACAF is in compliance with the SECDEF directive to reduce service contracts by 40%." Id. at 1463. On June 18, 2010, Deidra Gietz, Chief, Military Personnel Programs Branch for PACAF, prepared a PowerPoint presentation for use at the Contract Review Board meeting reporting that PACAF was "[c]urrently working with PACAF/A1M to explore any/all insourcing opportunities" with respect to the Contract. Id. at 1491-94. The presentation also included the May 4, 2010 In-Sourcing Worksheet and associated certifications. Id. at 1495-97.

On June 25, 2010, the final day of the Contract Review Board meeting, Jeffrey Allen, PACAF's Deputy Director of Manpower, Personnel and Services, approved a "Memorandum of Intent to In-source" the Contract. Id. at 1510-12. The memorandum stated that the Contract was a "viable candidate for in-sourcing" and further explained that the in-sourcing was justified by cost, citing the DTM-COMPARE cost analysis showing a cost savings of $1,186,048.00. Id. at 1512. Mr. Allen approved the Memorandum of Intent to In-source in response to an e-mail request from Vincent E. Gasaway, Chief of the Air Force's Manpower and Organization Division. Id. at 1510-11. Mr. Gasaway's e-mail stated that, upon receiving Mr. Allen's approval of the memorandum, Mr. Gasaway would forward the signed memorandum and In-Sourcing Worksheet to AFMA "to complete the analysis process." Id. at 1511.

Several weeks later, on July 20, 2010, Mr. Allen sent an e-mail to Mr. Hogue stating the following:

> Where are we at on in-sourcing the MPF contract? Believe the plan is to in-source. If so, we're late to need [sic] for FY11.need to be posturing for FY12.

9

Many moving parts to work out.communicating intent to in-source with FSS/CCs, transition plan, writing PDs, classification actions, hiring, etc.

Let's build a plan then meet with the boss on the way ahead.  Thanks.

Id. at 1528.  Capt. Munro, who was copied on Mr. Allen's e-mail, replied stating, "The MPF contract has been approved by AFMA for conversion[.]"  Id.  A spreadsheet circulated two days later indicates that AFMA "approved" the Contract for in-sourcing on July 16, 2010, and that PACAF was "[v]erifying CME [Contractor Manpower Equivalent] positions for conversion before placing on the books."  Id. at 1545-56.  By e-mail dated August 19, 2010, Traci H. Hunter, PACAF's In-sourcing Program Manager, informed Mr. Baker: "Your request to convert contract FA5215-08-C-0008 to civilian is approved effective 1 Apr 12.  The conversion results in the addition of 25 civilians."  Id. at 1554.

The DTM-COMPARE file that AFMA reviewed and approved, however, differed in one respect from the cost comparison certified on June 17, 2010.  See Def.'s Br. filed Nov. 2, 2012, at 7 n.6.  The June 17, 2010 cost comparison was based upon an error in calculating Line 5 – "Additional Costs" – in DTM-COMPARE.  See id; AR 1513.  Under the Air Force's in-sourcing guidance, Line 5 costs are calculated by multiplying the anticipated number of in-house full-time equivalents ("FTEs") by certain set amounts for recruitment ($5.00), child development ($312.00), training ($839.00), and groceries ($322.00), and then slightly inflating those amounts for each performance period.  See AR 95-99, 1322-33, 1338-41.  In the June 17, 2010 cost comparison, PACAF incorrectly used 1 FTE as the multiplier, rather than 25 FTEs, resulting in a cost savings of $1,186,048.00, or 9%.  See id. at 2, 1513.  Nevertheless, before AFMA reviewed the DTM-COMPARE file, PACAF apparently attempted to correct the error by mistakenly using 24 FTEs for Line 5—rather than 25 FTEs—resulting in an anticipated cost savings of $1,003,228.00.  See id. at 5, 727.  When AFMA reviewed this version of the cost comparison, it noted the error and re-calculated Line 5 with a multiplier of 25 FTEs, thereby reflecting a cost savings of $995,279.00, or 7.9%.  See id. at 727.

Between September 29, 2010, and November 15, 2010, the Air Force converted contractor manpower equivalent ("CME") positions to civilian positions in the Air Force's Manpower Programming and Execution System (the "MPES") 7/ for eight of the nine bases

---

7/  The MPES is a database containing Air Force manpower requirements and authorizations.  See Def.'s Br. filed Nov. 2, 2012, App. at 21 (Air Force Instruction 38-201 defining "Manpower Data System," the predecessor of the MPES).

(except Andersen AFB). 8/ Id. at 1180, 1187, 1194, 1201, 1207, 1213, 1219, 1225.  Each of those contractor-to-civilian conversions was made effective on April 1, 2012, immediately after the expiration of the Contract's third option period on March 31, 2012.  See id.

In early 2011 the Air Force exercised the third option period, April 1, 2011, to March 31, 2012, and funded the third option period through March 31, 2012.  See Pl.'s Br. filed Oct. 23, 2012, at 15 n.8; Def's Br. filed Nov. 2, 2012, at 3.  In January 2012, as the Contract was nearing the end of its third option period, several Air Force personnel exchanged e-mails in which they discussed how to proceed with the Contract.  See AR 1556-59.  In an e-mail dated January 25, 2012, Andy Trillo, PACAF's Resource Advisor, indicated that PACAF was considering a three-month "extension" or six-month "renewal" of the Contract.  Id. at 1558-59.  Ms. Nishimura responded that the Air Force had already sent Dellew a letter to "exercise the contract for one year."  Id. at 1558.  In a subsequent e-mail to Mr. Sakagawa, Ms. Nishimura explained:

---

8/  The CME positions for Andersen AFB were removed from the MPES on July 26, 2010, see AR at 1048, because the United States Navy (the "Navy") had begun providing support for Andersen AFB's A&D and PSM programs pursuant to an October 1, 2009 Installation Support Memorandum of Agreement ("MOA") between the Navy and Air Force, Def.'s Br. filed Nov. 2, 2012, App. at 5 ¶ 1 (Decl. of Kathleen M. Rodriguez dated Nov. 2, 2012 ("Rodriguez Decl.")).  Under the MOA the Navy reimbursed the Air Force for the Andersen AFB portion of the Contract.  Rodriguez Decl. ¶ 3.  In November 2011 the Navy determined that it did not have the capability to in-source the A&D and PSM services at Andersen AFB and therefore began pursuing a new contract with Dellew.  Id. ¶ 5.  On September 30, 2012, upon the Air Force's termination of the Contract, the Navy awarded Contract No. N40192-12-C-7127 to Dellew for the A&D and PSM support services at Andersen AFB.  Id. ¶ 6.

The contract allows for an extension of services up to 6 months. [9/]  At the end of the extension the contract will expire and no options can be exercised.  If your intent is to extend the contract rather than exercise the option year, a revised letter will be sent to the contractor to change the performance period. A 60 day notification to the contractor before the contract expires is required. The contract expires 31 Mar 12.  Please let me know your intent.

Id. at 1557.  Mr. Sakagawa replied:  "PACAF/A1 would like to elect a 6-month extension to the . . . contract.  We understand with this extension that no option can be exercised."  Id. at 1556.  Ms. Nishimura confirmed receipt of Mr. Sakagawa's request to extend the Contract for six months.  Id.

Ultimately, the Air Force did not extend the Contract for six months pursuant to § 52.217-8, as the above e-mails indicated was originally contemplated.  See Lalau Decl., Ex. A (Modification No. P00010).  Modification No. P00010, dated February 29, 2012, "exercise[d] Option Period Four of the contract" while "incrementally fund[ing] the period for six months" from April 1, 2012, to September 30, 2012.  Id., Ex. A at 2.  The modification contained six Contract Line Item Numbers ("CLINs") describing work to be performed at each of the bases and identifying the "Period of Performance" as April 1, 2012 to March 31, 2013.  Id., Ex. A at 2-6.  Modification No. P00010 also listed the "delivery date" for each CLIN and SUBCLIN as April 1, 2012 to March 31, 2013.  Id.

On March 9, 2012, Mr. Baker prepared an internal memorandum stating: "We wish to terminate [Dellew's] contract effective 1 October 2012 because of DOD policy to reduce contracts."  Id. at 1560.  The Air Force formally notified Dellew on or about April 2, 2012,

---

9/  Ms. Nishimura likely was referring to the six-month extension provided for in 48 C.F.R. (FAR) § 52.217-8 (1999), which was incorporated into the Contract.  See AR 479-80. FAR § 52.217-8 – "option to extend services" – provides:

The Government may require continued performance of any services within the limits and at the rates specified in the contract.  These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor.  The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor at least 30 days prior to expiration of the existing contract.

Id.

12

that the Contract was being terminated for convenience effective October 1, 2012. 10/   Id. at 1561.  On May 4, 2012, Ms. Nishimura sent an e-mail requesting that Mr. Baker resubmit the March 9, 2012 internal memorandum because it "lack[ed] detail" and because "[t]he Contracting Officers required a detailed termination memo from [Mr. Baker's] office."  Id. at 1562.  By memorandum dated June 5, 2012, Mr. Hogue responded to Ms. Nishimura's request, as follows:

> 1.   We request termination of contract FA5215-08-C-0008, effective 30 September 2012.  The decision for terminating this contract is solely based on a Department of Defense policy directing a reduction of ten percent per year for the next three years on Service Supported Contracts.
>
> 2.   An in-house cost comparison was conducted that compared the cost of contract services versus the cost of those same services using Civil Service employees.  The comparison showed a cost savings to the military if we convert contract positions to Civil Service positions.
>
> 3.   PACAF A1 elected to extend the contract for six months to 30 Sep 12 to complete the entire fiscal year.  We acknowledge the partnership we have had with DELLEW and have been satisfied with their service during the period of this contract.

Id. at 1565.

The Contract was terminated for convenience on September 30, 2012, and the Air Force began performing the A&D and PSM work with military and civilian personnel on October 1, 2012, at eight of the nine bases (with Andersen AFB as the exception). Def.'s Br. filed Nov. 2, 2012, App. at 3 ¶¶ 8-10 (Decl. of Deidra Gietz dated Oct. 29, 2012 ("Gietz Decl.")).  PACAF now intends to hire a total of sixteen full-time civilian employees to perform these services at the eight bases, and one civilian employee who will spend approximately 15% of his time performing PSM work.  Gietz Decl. ¶¶ 10-11.  As of November 2, 2012, seven positions have been permanently filled, and an additional three positions have been filled on an emergency basis.  Id. ¶ 11.  PACAF anticipates that the other

---

10/   Although the notice is dated April 2, 2012, Dellew asserts that it first learned of the Air Force's intention to in-source the Contract on or about February 29, 2012.  See Lalau Decl. ¶ 4.

seven civilian positions will be filled no later than December 16, 2012. 11/ Id.  For the positions that have not yet been filled by civilians, military personnel are performing the A&D and PSM work on a temporary basis. Id. ¶ 12.

## PROCEDURAL HISTORY

On March 27, 2012, shortly before Dellew received the Air Force's Notice of Termination, Dellew submitted a Freedom of Information Act ("FOIA") request to determine the basis for the Air Force's in-sourcing decision. See Lalau Decl. ¶ 7, Ex. B.  Dellew received the Air Force's response on August 13, 2012, denying its FOIA request, in part, under FOIA Exemption (b)(6), 5 U.S.C. § 552b(6) (2006). 12/  Id. at ¶ 11, Ex. F. The substance of the response consisted of three pages: a copy of Dellew's FOIA request and two heavily redacted copies of the certifications associated with the May 4, 2010 In-Sourcing Worksheet. Id. at Ex. F.

Dellew appealed the partial denial of its FOIA request on August 16, 2012, contending that the Air Force improperly redacted the certifications and withheld material documents. Id. at Ex. G.  Lt. Col. David M. Cunningham, Chief of Administrative Law for PACAF, responded to Dellew's appeal by e-mail dated August 21, 2012, stating: "Upon review of the file, we did discover a memorandum that had been prepared for release to Ms. Lalau but had been accidentally left out of the response package."  Decl. of Jonathan A. DeMella dated Sept. 23, 2012 ("DeMella Decl.") at Ex. B.  Attached to Lt. Col. Cunningham's e-mail was a redacted copy of the June 25, 2010 Memorandum of Intent to In-Source the Contract and a copy of the May 4, 2010 In-Sourcing Worksheet. Id.  On August 30, 2012, Dellew sent a letter to Lt. Col. Cunningham requesting the release of all documents responsive to its March 27, 2012 FOIA request. Id. at Ex. C.  Lt. Col. Cunningham responded that same day, stating: "Thank you, we are in response of your appeal and will process it accordingly." Id. at Ex. D.

On September 24, 2012, one week before the Contract was to be terminated, plaintiff filed its complaint in the United States Court of Federal Claims, alleging that the Air Force's decision to in-source the Contract lacked a rational basis, was arbitrary and capricious, an

---

11/    The court did not give any consideration to the updated information in defendant's brief that should have been provided with a second declaration from Ms. Gietz. See Def.'s Br. filed Nov. 19, 2012, at 21 n.13.

12/    Although the cover letter to the Air Force's response is dated July 27, 2012, see Lalau Decl. at Ex. E, Dellew claims that it did not receive the Air Force's response until August 13, 2012, see id. ¶ 11.

abuse of discretion, and not in accordance with law.  Compl. filed Sept. 24, 2012, ¶¶ 23, 26. Plaintiff sought a temporary restraining order and preliminary injunction to enjoin the Air Force from terminating the Contract and in-sourcing the work performed by plaintiff under the Contract.  Id. at 7-8.  Defendant responded on September 26, 2012, arguing that plaintiff lacked standing to challenge the Air Force's in-sourcing decision.  See Def.'s Br. filed Sept. 26, 2012, at 6-13.  Oral argument was held that same day, during which defendant agreed promptly to produce an administrative record and plaintiff agreed to withdraw its motion for a temporary restraining order.  See Transcript of Proceedings, Dellew Corp. v. United States, No. 12-627C, at 58:3-15, 63:23-64:2 (Fed. Cl. Sept. 26, 2012).  Defendant filed the administrative record on October 12, 2012.

Pursuant to the parties' proposed briefing schedule, as adopted by the court, see order entered on October 3, 2012, plaintiff moved on October 23, 2012, for judgment on the administrative record.  Defendant filed its response and motion to dismiss and cross-motion for judgment on the administrative record on November 2, 2012.  Briefing was completed on November 19, 2012, and argument was held on November 30, 2012.

## DISCUSSION

I.  Standards of review

1.  Standard of review for bid protests

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, § 12 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests.  See Res. Conservation Grp., L.L.C. v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi").  The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA").  See 28 U.S.C. § 1491(b)(4) (2006).  The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2006); see also PGBA, L.L.C. v. United States, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary or capricious standard of APA to review procurement decisions); Domenico Garufi, 238 F.3d at 1332-33 (noting that standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny apply to bid protests).

15

Accordingly, as restated by the United States Court of Appeals for the Federal Circuit, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines if, under the arbitrary or capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law. 13/ Id.; see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004); Domenico Garufi, 238 F.3d at 1333; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. Domenico Garufi, 238 F.3d at 1333.

Agency action is arbitrary or capricious when it does not have a rational basis for its decision. A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion." Id. (internal quotation marks and citations omitted). The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute judgment for the agency. Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994). Indeed, the agency's discretion extends to determinations of realistic costs. See Halter Marine, Inc. v. United States, 56 Fed. Cl. 144, 172 (2003) ("Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis." (citation and quotation marks omitted)).

2. Standard of review for judgment on the administrative record

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c). This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." Bannum, 404 F.3d at 1356. Unlike the standard for ruling on a motion for summary judgment under RCFC 56(c), a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. at 1355-56.

---

13/ This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. See Domenico Garufi, 238 F.3d at 1332-33.

3.  Standard of review for motion to dismiss

Defendant moves to dismiss plaintiff's complaint under RCFC 12(b)(1) for lack of subject matter jurisdiction.  When a federal court hears such a jurisdictional challenge, "its task is necessarily a limited one."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Id.  The court must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader.  See Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (holding that when considering motion to dismiss courts are obligated "to draw all reasonable inferences in plaintiff's favor"); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (explaining that in considering motion to dismiss for lack of subject matter jurisdiction, courts "normally consider the facts alleged in the complaint to be true and correct" (citations omitted)).

4.  Standard of review for injunctive relief

Plaintiff seeks a permanent injunction enjoining the Air Force from in-sourcing the Contract.  The Federal Circuit has described injunctive relief as "extraordinary relief."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).  Adoption of the APA substantive standard of review did not change the standard for granting injunctive relief.  See PGBA, 389 F.3d at 1225-27 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief).  In order to obtain an injunction, the Federal Circuit requires a protestor to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, 389 F.3d at 1228-29).  Success on the merits previously has been held to be the most important factor for a court to consider when deciding whether to issue injunctive relief.  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007).

II.  Jurisdiction

Defendant moves this court to dismiss plaintiff's complaint based on jurisdictional grounds.  First, defendant argues that plaintiff lacks statutory standing because it is not an "interested party" under 28 U.S.C. § 1491(b)(1).  Def.'s Br. filed Nov. 2, 2012, at 14-16.  Second, defendant contends that plaintiff does not possess "prudential standing" to challenge the Air Force's in-sourcing decision because plaintiff's injury is not within the zone of

17

interests protected by 10 U.S.C. §§ 129a and 2463. Id. at 24-30. Finally, defendant emphasizes that plaintiff's complaint is moot because the court can no longer redress plaintiff's injury. Id. at 30-35. Before examining defendant's standing and mootness arguments, however, the court first must determine whether it has subject matter jurisdiction to review the Air Force's in-sourcing decision.

1.  Subject matter jurisdiction

Defendant urges this court to rely upon Judge Allegra's decision in Hallmark-Phoenix 3, L.L.C. v. United States, 99 Fed. Cl. 65 (2011), dismissing a contractor's protest of the Air Force's decision to in-source based upon the contractor's perceived lack of "prudential standing." See Def.'s Br. filed Nov. 2, 2012, at 24-30 (citing Hallmark-Phoenix). In a similar case involving a contractor's challenge to an in-sourcing decision, Triad Logistics Servs. Corp. v. United States, No. 11-43C, 2012 WL 5187846 (Apr. 16, 2012), Judge Horn observed that Hallmark-Phoenix addressed the case "from the perspective of prudential standing" and did not determine first whether the court had subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b)(1). Triad Logistics, 2012 WL 5187846 at *11. Judge Horn noted, however, that "the court first should determine whether there is subject matter jurisdiction generally, including subject matter jurisdiction to review in-sourcing decisions under 28 U.S.C. § 1491(b)(1)[.]" Id. This court favors Judge Horn's approach in Triad Logistics, and accordingly examines subject matter jurisdiction before turning to the issue of prudential standing.

The Court of Federal Claims has jurisdiction, pursuant to the Tucker Act, "to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). Although the Tucker Act does not define the terms "procurement" or "proposed procurement," the Federal Circuit in Distributed Solutions, Inc. v. United States, 539 F.3d 1340 (Fed. Cir. 2008), considered what constitutes a "procurement" for purposes of determining jurisdiction under § 1491(b)(1). Borrowing the definition of "procurement" provided by Congress in a statute relating to the Office of Federal Procurement Policy, 41 U.S.C. § 403(2) (2006) (re-codified at 41 U.S.C. § 111), the Federal Circuit held that "the phrase 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal acquisition contracting process, including 'the process for determining a need for property or services.'" Distributed Solutions, 539 F.3d at 1346. The court in Distributed Solutions further explained that "to establish jurisdiction pursuant to this definition, [a protestor] must demonstrate that the government at least initiated a procurement, or initiated 'the process for determining a need' for acquisition." Id. at 1346. The Federal Circuit also noted its holding in RAMCOR Services Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999), that "'the operative phrase 'in connection with' is very

sweeping in scope.'" Distributed Solutions, 539 F.3d at 1345 (quoting RAMCOR, 185 F.3d at 1289). RAMCOR also held that "[t]he language of § 1491(b) . . . does not require an objection to the actual contract procurement . . . . As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." 185 F.3d at 1289.

In this case the Air Force's decision to in-source necessarily involved a determination that the Air Force required A&D and PSM support services and that Air Force civilian personnel could provide these services more cheaply than Dellew. The Air Force's decision to in-source therefore involved a "process for determining a need for property or services" and was made "in connection with a procurement or proposed procurement." See Distributed Solutions, 539 F.3d at 1346 (internal quotation marks omitted). For this reason plaintiff's protest of the Air Force's in-sourcing is properly within this court's subject matter jurisdiction under § 1491(b). Defendant does not appear to dispute that the in-sourcing decision was made "in connection with a procurement or proposed procurement," as defined by the Federal Circuit. See Def.'s Br. filed Nov. 2, 2012, at 12-16. The Court of Federal Claims has considered this issue in at least three other cases, and on each occasion has held that a decision to in-source is made "in connection with a procurement or proposed procurement." See Elmendorf Support Servs. Joint Venture v. United States, 105 Fed. Cl. 203, 208 (2012) ("Elmendorf I"); Triad Logistics, 2012 WL 5187846, at *9-16; Santa Barbara Applied Research, Inc. v. United States, 98 Fed. Cl. 536, 542-43 (2011). This case therefore falls within the court's "broad grant of jurisdiction" under § 1491(b). See Sys. Application & Techs., Inc., v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

2. Statutory standing

In addition to requiring that the action must be "in connection with a procurement or a proposed procurement[,]" § 1491(b) also requires the plaintiff to be an "interested party" to proceed with a bid protest in this court. 28 U.S.C. § 1491(b). The Federal Circuit held in Distributed Solutions that a plaintiff is an "interested party" under § 1491(b) if it establishes that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." 539 F.3d at 1344 (citation omitted). The Federal Circuit borrowed this definition from the Competition in Contracting Act, which "explicitly defines [the term 'interested party'] as 'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'" Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

Other judges of the Court of Federal Claims have considered whether an incumbent contractor is an "interested party" for purposes of § 1491(b) when it challenges an agency's

decision to in-source. Judge Firestone concluded in <u>Santa Barbara</u> that such a plaintiff is an "interested party" because, in part, "[w]here, as here, [the plaintiff] has a track record of winning contracts for the work that the Air Force is now in-sourcing, the economic impact to [the plaintiff] cannot be denied." 98 Fed. Cl. at 543. The plaintiff in that case satisfied the "interested party" standard because it held a government contract and claimed that it "would expect to compete for future government contracts but for the errors made by the Air Force in its in-sourcing decision[.]" <u>Id.</u> In a subsequent case, <u>Elmendorf I</u>, Judge Bruggink similarly held that a contractor protesting an in-sourcing decision was an "interested party" because "there is a substantial chance that, given the opportunity, plaintiff would perform the services in the future." 105 Fed. Cl. at 209. The court based this finding on the fact that the plaintiff "in its most recent contract performance assessment report . . . was rated as excellent, and for the duration of the contract, there is no dispute that plaintiff has performed well." <u>Id.</u>

The court finds <u>Santa Barbara</u> and <u>Elmendorf I</u> instructive on this issue. At the time plaintiff filed its complaint in this case on September 24, 2012, it was providing A&D and PSM services to the Air Force pursuant to the Contract. As did the plaintiffs in <u>Santa Barbara</u> and <u>Elmendorf I</u>, Dellew has a track record of success, and Mr. Hogue's termination memorandum stated that the Air Force was satisfied with Dellew's performance. AR 1565. Absent the Air Force's decision to in-source the Contract, Dellew likely would continue to provide the A&D and PSM services for the Air Force in the future. Plaintiff therefore has satisfied the "interested party" requirement of § 1491(b) because it is an "actual or prospective bidder or offeror" with a "direct economic interest in the procurement or proposed procurement." <u>See</u> <u>Distributed Solutions</u>, 539 F.3d at 1344.

Relying on <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352 (Fed. Cir. 2009), defendant contends that a protestor is an "interested party" only if it can demonstrate, at a minimum, that it suffered a "'non-trivial competitive injury which can be addressed by judicial relief.'" Def.'s Br. filed Nov. 2, 2012, at 14 (quoting <u>Weeks Marine</u>, 575 F.3d at 1362). Defendant argues that plaintiff has not suffered a "non-trivial competitive injury" because the Air Force has not shifted plaintiff's work to any of plaintiff's competitors and has not issued a new solicitation that puts plaintiff at a disadvantage vis-a-vis its competitors. <u>Id.</u> at 14-15. Defendant also emphasizes that neither 10 U.S.C. § 2463 nor 10 U.S.C. § 129a mandates any kind of formal public-private competition. <u>Id.</u> at 15.

Judge Firestone squarely addressed the same argument in <u>Santa Barbara</u>, noting that the Federal Circuit established the "non-trivial competitive injury" test in <u>Weeks Marine</u> in the context of a pre-award bid protest. 98 Fed. Cl. at 543. The court is especially mindful of this distinction, given the Federal Circuit's recent explanation that the "non-trivial competitive injury" standard applicable in <u>Weeks Marine</u> does not apply in a post-award protest. <u>COMINT Sys. Corp. v. United States</u>, No. 2012-5039, 2012 WL 6062509, at *5 n.7 (Dec. 7,

2012); see also Sys. Application, 691 F.3d 1374, 1382 (explaining that "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest'"). Judge Firestone also observed that in an analogous case, LABAT-Anderson, Inc. v. United States, 65 Fed. Cl. 570 (2005), the Court of Federal Claims held that an incumbent contractor was an "interested party" for purposes of challenging an agency's decision not to out-source work. Santa Barbara, 98 Fed. Cl. at 543 (citing LABAT-Anderson, 65 Fed. Cl. at 575-76). LABAT-Anderson did not involve a solicitation or a formal public-private competition, and the court held in that case that the plaintiff did not need to protest a recent or ongoing solicitation to have standing as an "interested party." LABAT-Anderson, 65 Fed. Cl. at 575-76. As Santa Barbara and LABAT-Anderson, this case "involves the loss of future contract work by a protestor with a direct and real economic interest in the government's decision[,]" and therefore satisfies the "interested party" test for standing. See Santa Barbara, 98 Fed. Cl. at 544.

Defendant also challenges plaintiff's status as an "interested party" based on dicta in Hallmark-Phoenix that noted the "pile of assumptions" that were necessary to find the plaintiff to be an interested party where there was no outstanding solicitation for the services at issue. Def.'s Br. filed Nov. 2, 2012, at 15 (quoting Hallmark-Phoenix, 99 Fed. Cl. at 68). Hallmark-Phoenix is unhelpful to defendant on this issue, however, because Judge Allegra merely cast doubt on whether the plaintiff was an "interested party" and expressly declined to decide the case on those grounds. See Hallmark-Phoenix, 99 Fed. Cl. at 68.

The court acknowledges that in two recent opinions, Triad Logistics, 2012 WL 5187846, and Elmendorf Support Services Joint Venture v. United States, No. 12-346C, 2012 WL 3932774 (Sept. 10, 2012) ("Elmendorf II"), the Court of Federal Claims held that a protestor lacked standing to challenge the government's decision to in-source. Triad Logistics involved a plaintiff whose contract had already ended by the time it filed its complaint. 2012 WL 5187846, at *20-21. Because the agency had begun performing the services previously performed by the plaintiff, defendant argued that the court could not redress the plaintiff's injury by ordering the agency to reverse the in-sourcing decision. Id. at *21. Such a remedy, defendant contended, would require the agency to conduct a public-private competition in violation of the Omnibus Appropriations Act of 2009. Id. at *20-21. Judge Horn agreed with defendant, explaining that "the difficulties in fashioning a workable remedy, and, therefore, providing redress to this plaintiff . . . [are] further reason why plaintiff does not have standing to challenge the DoD in-sourcing decision." Id. at *21. The court confronted similar facts in Elmendorf II. Following Judge Bruggink's denial of defendant's motion to dismiss and the plaintiff's motion for a preliminary injunction in Elmendorf I, 105 Fed. Cl. 203, the plaintiff amended its complaint to reflect the fact that its contract had expired. Elmendorf II, 2012 WL 3932774, at *1-2. Because the plaintiff's contract had expired by its terms, it could resume work only if the agency conducted a competition. Id. The court therefore held that the

plaintiff lacked standing because the plaintiff no longer had a direct economic interest in the contract work, and the court could no longer redress the plaintiff's injury. Id. at *3-4.

Although Triad Logistics and Elmendorf II framed the issue in terms of standing, this court agrees with defendant that the mootness doctrine provides the proper context for considering the effect of the Contract termination on the court's ability to fashion a remedy for plaintiff. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) ("The confusion [of mootness and standing] is understandable, given this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness.'"); Def.'s Br. filed Nov. 2, 2012, at 33-34. The mootness doctrine comes into consideration in this case because the in-sourcing of the work and termination of the Contract occurred after plaintiff filed its complaint. The court addresses this issue below.

3. Mootness

As with standing, the mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution. Gerdau Ameristeel Corp. v. United States, 519 F.3d 1336, 1340 (Fed. Cir. 2008) (citing Allen v. Wright, 468 U.S. 737, 750 (1984); North Carolina v. Rice, 404 U.S. 244, 246 (1971)). Federal courts are permitted only to entertain matters in which there is an ongoing justiciable issue. See NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998). Accordingly, mootness implicates the court's subject matter jurisdiction. Id. ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction." (citation omitted)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969) (citation omitted). "Thus, to avoid dismissal for mootness, an actual controversy must remain at all stages, not merely at the time the complaint is filed." Gerdau Ameristeel, 519 F.3d at 1340 (citation omitted).

A case will be dismissed as moot if an intervening event during its pendency "renders it impossible for [the] court to grant any effectual relief[.]" Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1372 (Fed. Cir. 2000) (holding tax refund suit not moot despite plaintiff's subsequent compliance with tax refund statute because plaintiff could potentially recover additional taxes under Tucker Act rather than under tax refund claim); see also 15 Moore's Federal Practice § 101.93[2] (Matthew Bender 3d ed.) ("A claim may . . . be rendered moot because the plaintiff, as a result of some intervening factual event, has lost a present right to be vindicated or no longer has a stake or interest in the outcome of the litigation."). As explained by the United States Supreme Court, "Jurisdiction, properly

22

acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and, (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citations omitted). "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law." Id.

Relying on Triad Logistics and Elmendorf II, defendant argues that plaintiff's complaint is moot because the court is unable to redress plaintiff's injury. Def.'s Br. filed Nov. 19, 2012, at 4-8. Defendant points out that the Contract has been terminated and that Air Force personnel have begun performing work at eight of the nine bases. 14/ See id. at 4. The court cannot now require the Air Force to provide this work to plaintiff, defendant argues, because DoD is prohibited by statute from converting the work from Federal to contractor performance. Def.'s Br. filed Nov. 2, 2012, at 32-34. Pursuant to 10 U.S.C. §§ 129(a)(e) and 2461, the Air Force must conduct a public-private competition to out-source the work from federal employees to contractors. Id. The Air Force cannot conduct such a public-private competition, however, because it is still subject to the moratorium on public-private competitions imposed pursuant to the Omnibus Appropriations Act of 2009. Id. Due to these statutory provisions regarding out-sourcing, defendant finds the court powerless to afford a legal remedy.

Plaintiff responds that its complaint is not moot because the Air Force unfairly placed plaintiff in a Catch-22 by intentionally failing to timely and properly respond to plaintiff's March 27, 2012 FOIA request. Pl.'s Br. filed Nov. 9, 2012, at 17-19. Because the Air Force delayed until August 2012 to provide plaintiff with the Memorandum of Intent to In-Source and In-sourcing Worksheet, plaintiff did not file its complaint until one week before the termination of the Contract. See id. at 18-19. Absent defendant's "bad-faith" conduct in responding to plaintiff's FOIA requests, plaintiff would have filed its complaint earlier, and the Contract thus would not have expired during the pendency of this litigation. Id. at 16-19.

Even assuming that plaintiff could show that the Air Force's alleged "bad-faith" conduct substantiated an exception to the mootness doctrine, 15/ plaintiff has failed to

---

14/ Dellew is still performing work at the ninth base—Andersen AFB—pursuant to its contract with the Navy. See Def.'s Br. filed Nov. 19, 2012, at 4.

15/ Exceptions to the mootness doctrine include defendant's voluntary cessation of improper conduct to avoid judicial review, see Military Order of the Purple Heart v. Sec'y of Veterans Affairs, 580 F.3d 1293, 1295 (Fed. Cir. 2009); conduct capable of repetition yet

23

demonstrate that the Air Force's responses to plaintiff's FOIA requests constituted "bad faith." Although the court understands plaintiff's frustration with the Air Force's dilatory and incomplete responses and inability to produce complete records, 16/ plaintiff has not shown that the Air Force delayed its response to plaintiff's FOIA requests or provided incomplete responses with the intention of mooting plaintiff's potential lawsuit.

The court nevertheless rules that a remedy could be fashioned for plaintiff, assuming success on its claim for permanent injunctive relief, and therefore plaintiff's complaint is not moot. This case is distinguishable from Elmendorf, in which the plaintiff's contract ended "by its own terms" because the agency in that case declined to exercise an additional three-month option period. Elmendorf I, 105 Fed. Cl. at 206-07; see also Elmendorf II, 2012 WL 3932774 at *1-2. Dellew's contract, in contrast, was terminated for convenience in the middle of an option period. Modification No. P00010 reflects that the Air Force exercised the fourth option period and that the "[p]eriod of [p]erformance" for that option period was April 1, 2012, through March 31, 2013. Lalau Decl., Ex. A. If the Air Force had not terminated the Contract, effective October 1, 2012, Dellew still would be performing work through the end of the fourth option period. 17/ Until the fourth option period expires by its terms, on March 31, 2013, this court could order a return to the pre-termination status quo for the remaining months of the fourth option year. Plaintiff's complaint therefore is not moot at this time.

4. Prudential standing

Defendant also contends that plaintiff's complaint should be dismissed for lack of prudential standing. Def.'s Br. filed Nov. 2, 2012, at 24-30. Prudential standing is a "judicially self-imposed limit[] on the exercise of federal jurisdiction[,]" requiring that a "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett v. Spear, 520 U.S. 154, 162 (1997) (quotation marks and citations omitted); see also WiAV Solutions,

---

15/ (Cont'd from page 23.)

evading review, see Humane Soc'y of the United States v. Clinton, 236 F.3d 1320, 1331 (Fed. Cir. 2001); and the availability of collateral relief, see CCL Serv. Corp. v. United States, 43 Fed. Cl. 680, 689-90 (1999).

16/ As discussed above, the court is baffled as to why the Air Force failed to include Modification No. P00010 in the administrative record.

17/ Defendant did not dispute this point during oral argument.

24

L.L.C. v. Motorola, Inc., 631 F.3d 1257, 1265 n.1 (Fed. Cir. 2010).  Defendant urges the court to follow Hallmark-Phoenix, which held that an incumbent contractor lacked prudential standing under the pre-2011 versions of §§ 129a and 2463(e) to challenge the Air Force's decision to in-source.  See Def.'s Br. filed Nov. 2, 2012, at 24-30; see also Hallmark-Phoenix, 99 Fed. Cl. at 74 n.15, 76.    The court in Hallmark-Phoenix emphasized that the contractor lacked prudential standing because the statutes and associated DoD guidelines arose in a "limited budgetary context."  Id. at 74.    Because the in-sourcing statutes included Congressional reporting requirements, the court reasoned, Congress signaled its intent to enforce the statutes through Congressional oversight rather than private enforcement.  Id. at 76-77.

     This court cannot heed the clarion call of Hallmark-Phoenix.  While the pre-2011 versions of §§ 129a and 2463(e) 18/ were enacted in a "budgetary context," see id. at 74, the context of the legislation alone is not a conclusive determinant of prudential standing.  The fact that Congress included a legislative reporting requirement also is not controlling.  Under the reasoning applied in Hallmark-Phoenix, plaintiff would lack standing, as well, under the NDAA for Fiscal Year 2012, which requires certain in-sourcing decisions to be based upon a cost savings of $10,000,000.00 or 10% of personnel-related costs.  It is doubtful whether Congress would have intended such a result.  DoD procedures required by the statutory provisions at issue in this case place limits on the ability of DoD to convert from contractor to civilian performance.  An incumbent contractor arguably comes within the zone of interests protected and therefore has prudential standing to challenge an in-sourcing decision under these statutes and regulations.

III.  Injunctive relief

     Plaintiff seeks injunctive relief in the form of an order enjoining the Air Force's decision to in-source. 19/ Pl.'s Br. filed Nov. 9, 2012, at 31-33.  When considering a request

---

     18/  The court analyzes prudential standing under the versions of §§ 129a and 2463(e) that were in effect when the Air Force made its decision to in-source in 2010. For reasons explained below, the court finds that the decision was made in 2010, with the consequence that the Ike Skelton NDAA and the NDAA for Fiscal Year 2012 do not apply to the in-sourcing decision in this case.

     19/  Plaintiff also argues that defendant should be equitably estopped from (1) asserting that plaintiff does not have standing and (2) proceeding with its in-sourcing decision.  Pl.'s Br. filed Oct. 23, 2012, at 27.  Equitable estoppel, however, does not apply to the case at bar.  A party cannot rely upon equitable estoppel arguments to satisfy the "threshold requirements of jurisdiction and standing."  Anderson v. Merit Sys. Prot. Bd., 12

for permanent injunctive relief, a court must consider four factors.  While success on the merits is the most important factor, success on the merits does not entitle a protester to an injunction.  See eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-94 (2006) (holding that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised with traditional principles of equity").  Besides (1) success on the merits, injunctive relief requires a plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest.  PGBA, 389 F.3d at 1228-29 (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

   1.  Success on the merits

   Plaintiff contends that the Air Force's decision to in-source the Contract was contrary to law because it violated 10 U.S.C. § 2463(e), effective December 31, 2011, which requires the Secretary of Defense to "ensure that the difference in the cost of performing the function by a contractor compared to the cost of performing the function by Department of Defense civilian employees would be equal to or exceed the lesser of . . . (I) 10 percent of the personnel-related costs for performance of that function; or (ii) $10,000,000." 10 U.S.C. § 2463(e) (Supp. V 2011); see Pl.'s Br. filed Oct. 23, 2012, at 7-8, 23.  Because the Air Force's decision to in-source the Contract was based on a cost comparison demonstrating a savings of $995,279.00, or 7.9%, see AR 727, plaintiff argues that the in-sourcing decision violated the 10% requirement in § 2463(e), see Pl's Br. filed Oct. 23, 2012, at 23.

   Section 2463(e) does not apply retroactively, however, and the Air Force was bound to comply with the requirements of that statute only if the Air Force made its decision to in-

───────────────────

   19/  (Cont'd from page 25.)

F.3d 1069, 1071 (Fed. Cir. 1993) (explaining that "[e]stoppel requires a forum; it cannot be used to build a forum").  Plaintiff also cannot invoke the doctrine of equitable estoppel to estop the Air Force from proceeding with the in-sourcing decision, because plaintiff has not shown that the Government engaged in some form of "affirmative misconduct."  Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (holding that "affirmative misconduct is a prerequisite for invoking equitable estoppel against the government").  As discussed above, plaintiff has not pointed to record evidence demonstrating that the Air Force's failure to produce complete records in response to plaintiff's FOIA request amounted to "bad faith" or "affirmative misconduct."

source on or after the effective date of the statute – December 31, 2011.  Plaintiff impliedly concedes this point in its brief, see id. at 5, 23, and attempts to explain why the Air Force's decision to in-source did not occur in 2010 when the Air Force conducted, certified, and approved the cost analysis.  Plaintiff emphasizes that both Mr. Hogue's June 17, 2010 certification of the May 4, 2010 cost comparison and Mr. Allen's June 25, 2010 Memorandum of Intent to In-Source contain prospective language that merely reflects a "preliminary step" or an "intent" to in-source the Contract at some point in the future, rather than an executed "decision" to in-source in 2010.  Id. at 17-18.  For example, the express language in the subject line of the June 25, 2010 memorandum refers to an "Intent to In-Source a Contracted Activity."  Id. at 17.  Similarly, the memorandum identifies Dellew as a "viable candidate" for in-sourcing and states that the Contract "may be in-sourced."  See id. at 17-18 (quoting AR 1).  Plaintiff also characterizes Mr. Allen's July 20, 2010 e-mail to Mr. Hogue – which stated that there were many "moving parts to work out" regarding "the plan" to in-source the Contract – as a mere "expression of intent to in-source."  See id. at 21 (quoting AR 1528).

According to plaintiff, the Air Force did not make the decision to in-source the Contract until 20 months later, on March 9, 2012, when Mr. Baker prepared an internal memorandum stating:  "We wish to terminate [Dellew's] contract effective 1 October 2012 because of DOD policy to reduce contracts."  See id. at 23; AR at 1560.  To support its interpretation of the facts, plaintiff relies on a trio of cases from the Court of Federal Claims purportedly establishing that "the cost analysis is a necessary forerunner to the in-sourcing decision, which is separate and distinct from the event constituting the actual in-sourcing decision, such as when the contractor is notified of its contract termination."  20/ See Pl's Br. filed Oct. 23, 2012, at 20 (citing Santa Barbara, 98 Fed. Cl. 536; Hallmark-Phoenix, 99 Fed. Cl. 65; Triad Logistics, 2012 WL 5187846).  Because the decision to in-source did not occur until March 2012, plaintiff concludes, the Air Force was obligated to comply with the current version of 10 U.S.C. § 2463(e) requiring a cost savings of $10,000,000.00 or 10%.  Id. at 23.

Defendant takes the position that the Air Force made the decision to in-source by no later than July 2010 when AFMA approved the in-sourcing of the Contract.  Def.'s Br. filed Nov. 2, 2012, at 17-23.  Upon AFMA's validation and approval of the cost comparison, the

---

20/ Although plaintiff appears to equate the Government's notification to the contractor of contract termination as the event constituting an in-sourcing decision, plaintiff contrarily argues that Mr. Baker's March 9, 2012 internal e-mail constituted the in-sourcing "decision" in this case.  See id. at 23.  As discussed above, Dellew first learned of the Air Force's intention to in-source the Contract on or about February 29, 2012, see Lalau Decl. ¶ 4, and Dellew did not receive a formal notice of termination until April 2, 2012, see AR 1561.

in-sourcing decision was final, and PACAF began implementing that decision in late 2010 by converting CME positions to civilian positions in the MPES system for eight of the nine bases. Id. at 20. Relying on the August 4, 2010 PACAF In-Sourcing Guide, defendant argues that an in-sourcing decision is final upon AFMA approval – not when the agency takes action to terminate the contract. Id. at 17. Defendant also points out that the decision to in-source cannot be equivalent to the decision to terminate the contract, because a contract termination is not a necessary step in the in-sourcing process. Id. at 19-20. Indeed, the May 28, 2009 In-Sourcing Implementation Guidance recommends that DoD components generally should not terminate contracts to accomplish in-sourcing goals, but, rather, should let contracts "run their course." See AR 1250. Defendant therefore argues that the Contract termination was not tantamount to the in-sourcing decision itself, but was merely a part of the implementation of the in-sourcing decision. See Def.'s Br. filed Nov. 2, 2012, at 18-20.

The facts contained in the administrative record do not support a finding that the in-sourcing decision occurred in 2012. Although the various in-sourcing statutes and guidance documents do not define precisely when an in-sourcing decision is final, none of the guidelines equate an in-sourcing decision with a termination for convenience. In fact, the May 28, 2009 In-Sourcing Implementation Guidance correctly assumes that a termination is not even necessary to accomplish in-sourcing. See AR 1250. In this case, for example, PACAF could have achieved the in-sourcing on April 1, 2012, by allowing the Contract to expire by its terms at the end of the third option period. Accordingly, an agency's termination for convenience is not equivalent to its decision to in-source.

Plaintiff relies on Santa Barbara, Hallmark-Phoenix, and Triad Logistics to support the proposition that the decision to in-source occurs when the Government provides notice to the contractor. Not one of these cases really stands for this point. In Hallmark-Phoenix the court did not make a finding regarding the specific date of the in-sourcing decision, but merely concluded that the in-sourcing occurred prior to the effective date of the Ike Skelton NDAA – January 7, 2011. See 99 Fed. Cl. at 74 n.15. The court in Triad Logistics also did not determine the precise date on which the agency made its decision to in-source. See 2012 WL 5187846, at *4-5. In contrast, the court in Santa Barbara found that the Air Force made its decision to in-source in June 2010. See 98 Fed. Cl. at 540. This date, however, coincided with both the Air Force's notification to the contractor and the final date of the Air Force's cost comparisons. Id.

Plaintiff's focus on the language of the June 25, 2010 Memorandum of Intent to In-Source also is unavailing because that document pre-dated AFMA's validation and approval of the cost comparison in July 2010. The PACAF In-Sourcing Guide lists AFMA validation and approval as the last step in the in-sourcing "certification process." Id. at 1357. Mr. Allen's July 20, 2010 e-mail to Mr. Hogue similarly is unhelpful to plaintiff. The e-mail

merely reflected Mr. Allen's concerns regarding the implementation of the in-sourcing. Id. at 1528.

The court therefore finds that the decision to terminate the Contract and the Air Force's subsequent notification to the contractor were mere steps in the implementation of the in-sourcing decision. The decision to in-source occurred upon AFMA's approval of the cost comparison in July 2010, 21/ and therefore the Ike Skelton NDAA, effective January 7, 2011, and the NDAA for Fiscal Year 2012, effective December 31, 2011, do not apply to the case at bar. Accordingly, the Air Force was not required to adhere to the current version of 10 U.S.C. § 2463(e) requiring a cost savings of $10,000,000.00 or 10% of personnel-related costs.

Plaintiff also charges that, regardless of when the in-sourcing decision was made, the Air Force's decision was not supported by a proper cost analysis and therefore was irrational and contrary to the pre-2012 statutes and regulations. Pl.'s Br. filed Oct. 23, 2012, at 23-27. Plaintiff presents two principal objections to the substance of the Air Force's in-sourcing decision. First, plaintiff argues that the Air Force should have conducted a new cost comparison because the 2010 cost comparison was "stale" and contained the following errors: (1) a failure to include the full amount of Line 5 "Additional Costs" and correct number of FTEs; (2) the inclusion of Andersen AFB; and (3) a failure to account for the increase in salaries for civil service employees from 2010 to October 2012, the eventual date of the in-sourcing. Id. at 24-25. Second, plaintiff takes issue with the fact that PACAF is now performing the work with military personnel. Id. at 24-25. Plaintiff cites the use of military personnel as contrary to the May 28, 2009 In-Sourcing Implementation Guidance, which provides that "[c]ontracted services can only be converted to military performance in very limited circumstances – i.e., when the work is determined to be military essential or justified as a legitimate military exemption consistent with DoD Instruction 1100.22." Id. at 25 (citing AR 1244 n.1). Plaintiff further emphasizes that the Air Force failed to fully justify the use of military personnel and consider the advantages of converting to military personnel in accordance with 10 U.S.C. § 129a (2006). Id. at 25-26.

---

21/ The court considered and rejected the possibility that the Navy's November 2011 decision not to in-source the work at Andersen AFB significantly changed the scope of the in-sourcing and therefore superseded the initial decision to in-source. Because the Navy's decision impacted only one of the nine bases and affected a small percentage of the contracted work, however, it did not fundamentally alter the nature of the initial in-sourcing decision. See supra note 8.

The court finds that the Air Force was under no legal obligation to conduct a new cost comparison shortly before it terminated the Contract for convenience. Although the May 28, 2008 In-Sourcing Implementation Guidance instructs DoD to in-source "as expeditiously as possible" once a cost comparison shows that civilian performance will be more cost effective, AR 1246, the Guidance does not specify the "required timeframe" for implementing an in-sourcing decision, <u>id.</u> at 1251. The Guidance acknowledges, however, that it often will not be practicable for the Government to fully implement the in-sourcing and begin hiring civilian employees immediately after it conducts the cost comparison. The Guidance therefore allows the Government to "obtain contract support on a temporary basis (not to exceed 12 months at a time)" while it "formulate[s] a plan for transitioning to DoD civilian employee performance[.]" <u>Id.</u> Mr. Allen's July 20, 2010 e-mail to Mr. Hogue indicates that the in-sourcing of the Contract involved "[m]any moving parts to work out," including hiring civilian employees and formulating a transition plan. <u>Id.</u> at 1528. Accordingly, the Air Force "obtain[ed] contract support on a temporary basis (not to exceed 12 months at a time)," <u>see</u> <u>id.</u> at 1251, when it exercised the third and fourth option years of the Contract.

Plaintiff also has not made the related showing that the errors in the cost comparison resulted in a "clear and prejudicial violation of applicable statutes or regulations." <u>Domenico Garufi</u>, 238 F.3d at 1333 (quotation marks and citations omitted). RMD 802 provides that an in-sourcing decision based upon cost savings must be supported by a cost analysis showing that the "DoD civilian employees would be the *most cost effective provider*." AR 1252 (emphasis added). RMD 802 further explains that the cost analysis must be compliant with the business rules and procedures outlined in DTM 09-007. <u>See</u> <u>id.</u> The final cost comparison that AFMA approved in July 2010 showed that in-sourcing would result in a cost savings of $995,279.00. <u>See</u> AR 727. To the extent the Air Force's cost comparison contained errors, those errors did not prejudice plaintiff because the cost comparison still results in a considerable cost savings when the errors are taken into account. PACAF's initial failure to include the full amount of Line 5 "Additional Costs" and correct number of FTEs was not prejudicial to plaintiff because the AFMA corrected these errors when it validated and approved the cost comparison. <u>See</u> <u>id.</u> The inclusion of Andersen AFB in the cost comparison also was not prejudicial. The DTM-COMPARE Reports segregated each base for purposes of determining the cost of civilian performance, and only three of the 25 FTEs in the cost comparison were designated for Andersen AFB. <u>See</u> <u>id.</u> at 22-27. Defendant points out that, even if Andersen AFB is excluded from the calculus, the in-sourcing results in a cost savings of more than $878,000.00. <u>See</u> Def.'s Br. filed Nov. 2, 2012, at 43-44. Finally, the cost comparison's failure to account for an increase in civil service salaries from 2010 to 2012 was not prejudicial, because Dellew's contract price likewise escalated during that time period. AR 433-66.

The Air Force acted reasonably under the circumstances when it decided to terminate the Contract based upon the 2010 cost comparison. As explained above, the cost comparison showed that in-sourcing would result in a cost savings, and an updated cost comparison would not materially alter the analysis. Plaintiff suggests that the 2010 cost comparison was flawed and irrational because Ms. Gietz now believes that the Air Force can perform the work with fewer than seventeen civilian employees—five fewer employees than the Air Force initially contemplated for the eight bases. Nonetheless, plaintiff has failed adequately to explain why the Air Force should be required to conduct a new cost comparison when the 2010 analysis actually may have underestimated the cost savings resulting from in-sourcing.

Finally, the court finds that PACAF's decision to temporarily use military personnel was not irrational or contrary to law. PACAF is in the process of hiring civilians to perform the work and is using military personnel only on a temporary basis until it completes the process of hiring the sixteen civilians. Gietz Decl. ¶¶ 10-12. The Air Force previously converted the CME positions to civilian positions in the Air Force's MPES system for eight of the nine bases. AR 1180, 1187, 1194, 1201, 1207, 1213, 1219, 1225. The record does not indicate that the Air Force has since converted those civilian positions to military positions. Because the Air Force is utilizing military personnel as a temporary stop-gap measure, the statutory provisions regarding "conversions" to military personnel, see id. at 1244 n.1, 10 U.S.C. § 129a (2006), are not applicable here.

Plaintiff has not shown that the Air Force's decision to in-source based upon the 2010 cost comparison resulted in a clear and prejudicial violation of law or lacked a rational basis. Plaintiff therefore has not prevailed on the merits.

2. Irreparable harm

Assuming that plaintiff had succeeded on the merits, the court next would have considered whether plaintiff made the requisite showing of irreparable harm if injunctive relief is not granted. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." Bannum, Inc. v. United States, 60 Fed. Cl. 718, 730 (2004) (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)). The loss of an opportunity to compete for a contract also has been found to constitute irreparable harm. See, e.g., Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (collecting cases).

Plaintiff contends that it has suffered irreparable harm because the Air Force's termination for convenience resulted in lost profits to plaintiff as the incumbent. Pl.'s Br. filed Nov. 9, 2012, at 34. Plaintiff also asserts that, regardless of whether the Air Force would

have decided to exercise the fifth option period of the Contract, it has been denied an opportunity to compete for the contract that lawfully was not subject to in-sourcing. Id. Plaintiff's claim for the opportunity to compete would have constituted irreparable harm.

### 3. Balance of hardships

Had plaintiff succeeded on the merits, defendant contends that the balance of hardships would tip in its favor because the Air Force is prohibited from out-sourcing the work to Dellew due to a statutory prohibition on conducting a public-private competition. Def.'s Br. filed Nov. 2, 2012, at 51. Defendant therefore argues that an injunction would result in the A&D and PSM services not being provided at the eight bases. See id. Defendant submitted Ms. Gietz's declaration to explain that these services enable PACAF to process "vital programs necessary to keep . . . bases running." Gietz Decl. ¶ 6. The court considered these arguments in its discussion of mootness and concluded that PACAF could reinstate plaintiff for the remainder of the fourth option period. Plaintiff has asserted that it stands ready to perform under the remaining period of the Contract. Although the court could not order reinstatement under this assumed scenario, it could have enjoined the Air Force from proceeding with the in-sourcing during the balance of the option period. Were the Air Force to reinstate plaintiff, the limited relief available on the duration of the option period would not constitute a new contract award.

### 4. The public interest

Finally, plaintiff argues that injunctive relief would serve the strong public interest in preserving the integrity of the procurement process and protecting taxpayer dollars. Pl.'s Br. filed Nov. 9, 2012, at 39-40. The court has found that the Air Force's decision to in-source was not based on a clear and prejudicial violation of an applicable procurement statute or regulation, nor did it lack a rational basis. The in-sourcing decision also was based on a proper cost comparison demonstrating a cost savings to the Government. Injunctive relief in this case therefore would serve neither goal.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss and plaintiff's motion for judgment on the administrative record are denied.  Defendant's cross-motion for judgment on the administrative record is granted.  The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED**.

No costs.

_____
**Christine Odell Cook Miller**
Judge